UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| DANIEL ISRAEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:04-CV-314 |
| ) | (VARLAN/SHIRLEY) |
| TENNESSEE DEPARTMENT OF ) | |
| MENTAL HEALTH AND ) | |
| DEVELOPMENTAL DISABILITIES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Daniel Israel initiated this civil action against his employer, Tennessee Department of Mental Health and Developmental Disabilities, claiming disability discrimination and harassment in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794(a).[1] Defendant has filed a motion for summary judgment [Doc. 25], which is now ripe for determination. After careful consideration of the parties' briefs [Docs. 26, 33, 36], the Court will grant defendant's motion for summary judgment and this case will be dismissed.

---

[1] In his Complaint, plaintiff also alleged that defendant discriminated against him on the basis of race and national origin in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and the Tennessee Human Rights Act. [Doc. 1 at ¶¶ 12, 14]. These claims, however, were dismissed with prejudice by stipulation. [Doc. 35.]

## I.     Relevant Facts

Plaintiff has been employed as a physician at Lakeshore Mental Health Institute ("Lakeshore") in Knoxville, Tennessee, since May 1, 1984. Lakeshore is owned and operated by defendant, an agency of the state of Tennessee. In August 2003, plaintiff was diagnosed with fibromyalgia, a condition that results in plaintiff becoming "extraordinarily fatigued as the work day progresses." [Doc. 1 at ¶ 9.] This condition causes him increased discomfort in the early afternoon, and plaintiff claims it is therefore necessary for him to "have an accommodation to work early and complete my shift at work by mid-afternoon." [Doc. 33, Israel Aff. at 2.] Plaintiff does not deny defendant's contention that his fibromyalgia does not otherwise limit him with respect to any of the activities which are necessary for him to carry out his job [Doc. 25, Pl. Depo. at 282-84], nor that is he unable to do anything since his diagnosis that he was able to do prior to it. [Doc. 26 at 29-30.]

Ordinarily, plaintiff worked a shift beginning at 8:00 a.m. and ending at 4:30 p.m. [Doc. 33, Israel Aff. at ¶ 2.] However, after plaintiff told defendant of his fibromyalgia diagnosis, defendant informed him that his shift would have to be changed to one beginning at 10:00 a.m. and ending at 6:30 p.m.[2] [*Id.*] Defendant asserts that this change was necessary because the workload after 4:30 p.m. had become too great for the one physician assigned to that time period to perform and it was therefore proposed that plaintiff work later in the day. [Doc. 36 at 5.] Plaintiff responded by telling defendant that his condition would not

---

[2]It is not clear from the record when plaintiff informed defendant of his fibromyalgia diagnosis or when defendant first informed plaintiff that his shift would need to be altered.

allow him to work until 6:30 p.m., and he submitted letters from his primary care physician, Dr. David Rankin, to support his contentions.[3]  [Doc. 33, Ex. A.]

Plaintiff asserts that starting in December 2003, defendant began to "press Plaintiff and his physician about working from 10:00 a.m. to 6:30 p.m." [Doc. 34 at 5] and continued to do so until April 2004, when plaintiff filed a charge of discrimination.  [Id. at 3.]  This alleged pressure from defendant took the form of correspondence from Leslie Hargrove, the medical director of Lakeshore, that was sent to plaintiff and his physician. [Doc. 33, Israel Aff. at ¶ 3; Doc. 33, Ex. A, B.]  This correspondence includes the following:

(1) An email sent to plaintiff on December 11, 2003 asking for a "written rationale" explaining plaintiff's medical condition, as well as "submitted MDs letters to that effect."  [Doc. 33, Ex. B.]

(2) An email sent to plaintiff on December 16, 2003 notifying plaintiff that he was to begin working the 10:00 a.m. to 6:30 p.m. schedule immediately and noting that Dr. Hargrove was "sensitive" to plaintiff's medical condition and that plaintiff was "certainly free to discuss this new schedule with HR." [Doc. 33, Ex. B.]

(3) A letter sent to plaintiff on December 22, 2003 asking for additional medical documentation from plaintiff's physician regarding his fibromyalgia and informing plaintiff that "[u]ntil the issues regarding your medical condition can be resolved, you will work your regular shift until January 2, 2004, at which time you will be expected to begin working 10:00 a.m. to 6:30 p.m." [Doc. 33, Ex. B.]

(4) A letter sent to plaintiff on January 2, 2004 informing him that he could continue to work the 8:00 a.m. to 4:30 p.m. schedule, but notifying him that the need for senior staff to expand their coverage might require that he "be

---

[3]The first of these letters from Dr. Rankin is dated November 10, 2003. [Doc. 33, Ex. A.]. Additional letters were sent from Dr. Rankin to Lakeshore on November 25, 2003, December 18, 2003, February 3, 2004, February 10, 2004, and February 24, 2004.  [Doc. 33, Ex. A.]

3

assigned some shift other than 8:00 to 4:30 to ensure the best patient care." [Doc. 33, Ex. B.]

(5) A letter sent to plaintiff on January 30, 2004 asking that he submit doctor's excuses for plaintiff's alleged absences from work. The letter also requests that plaintiff ask his physician to reply to Dr. Hargrove's inquiries about plaintiff's medical condition "so that we can determine whether or not we can count on your ability to routinely work your assigned shift." [Doc. 33, Ex. B.]

(6) A letter sent to plaintiff on February 9, 2004 asking that plaintiff provide excuses for seven occasions in January 2004 when plaintiff was absent from work due to illness. [Doc. 33, Ex. B.]

Additionally, Laura Morton, director of Human Resources at Lakeshore, sent plaintiff a letter on June 8, 2004 containing a medical release, questionnaire and job description that she requested plaintiff forward to his physician for the purpose of determining plaintiff's "ability to perform the essential job functions of your job based upon the restrictions indicated by Dr. Rankin in his letters...." [Doc. 33, Ex. A.]

Also during this time, plaintiff received two emails from Dr. Hargrove asking whether plaintiff was planning to retire. [Doc. 33, Israel Aff. at ¶ 4.] This correspondence includes two brief emails informing plaintiff that "some staff members have suggested you are considering retiring, perhaps within the next several weeks" and asking plaintiff to clarify whether this was true "so that adequate coverage can be obtained for [Lakeshore] patients." [Doc. 33, Ex. C.] Plaintiff claims that defendant "was attempting to force me into retirement by changing my shift after they had been informed by my physician that my physical condition prohibited me from working those hours." [Doc. 33, Israel Aff. at ¶ 6.] Plaintiff also notes that he began seeing a psychiatrist during this time due to the "great mental and

4

physical stress" caused by the correspondence regarding the proposed work schedule. [Id. at ¶ 5.]

Defendant points out that plaintiff was never made to work the 10:00 a.m. to 6:30 p.m. schedule because another physician was hired for that shift. [Doc. 36 at 9.] Defendant also notes that plaintiff has been allowed to leave work early if he begins experiencing pain or fatigue. [Doc. 26 at 30.]

Presently, plaintiff is still employed by defendant [Doc. 25, Pl. Depo. at 284] and continues to work the 8:00 a.m. to 4:30 p.m. schedule. [Doc. 25, Pl. Depo. at 261-62.] Additionally, Plaintiff admits that his fibromyalgia has been accommodated by defendant in that he continues to work the 8:00 a.m. to 4:30 p.m shift and is permitted to take leave time as necessary. [Doc. 25, Pl. Depo. at 263-64.]

Plaintiff filed suit on July 13, 2004, alleging that defendant and three additional individual defendants discriminated against him on the basis of race and national origin in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and the Tennessee Human Rights Act, and discriminated against him on the basis of a disability and subjected him to a hostile work environment in violation of the Rehabilitation Act. [Doc. 1.] The race and national origin discrimination claims were dismissed with prejudice by stipulation on July 11, 2006, as were all claims against the individual defendants. [Doc. 35.]

## II. Analysis

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any

6

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

B. Disability Discrimination

Plaintiff asserts a claim of disability discrimination under the Rehabilitation Act, including a claim for failure to accommodate his disability. [Doc. 34 at 2-3.] Plaintiff argues that he is a qualified individual with a disability because his fibromyalgia substantially limits his major life activity of working and that defendant did not accommodate this alleged disability. [*Id.*]

Defendant presents two arguments in support of its motion for summary judgment. First, defendant argues that plaintiff is not disabled as defined by the Rehabilitation Act because he does not have a physical impairment that substantially limits any major life activity. [Doc. 26 at 28-30.] Second, defendant argues that even if plaintiff is disabled, defendant accommodated his alleged disability. [*Id.* at 30.]

For plaintiff to prevail on his claim that he was illegally discriminated against under the Rehabilitation Act, he must show that: (1) he is an individual with a disability; (2) he is qualified for the position; (3) defendant was aware of his disability; (4) an accommodation was needed because of a causal relationship existed between his disability and his request for accommodation; and (5) defendant did not provide the necessary accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004). In examining claims under the Rehabilitation Act, the Sixth Circuit looks to the standards provided by the Americans With Disabilities Act ("ADA"). *Burns v. City of Columbus Dep't. of Pub. Safety*, 81 F.3d 836, 842 (6th Cir. 1996)

7

("By statute, the ADA standards apply in Rehabilitation Act cases alleging employment discrimination.").

Under the ADA, a disability is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual:
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The ADA does not define or otherwise designate those things that constitute "major life activities." However, the EEOC regulations on the ADA state that "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[4] 29 C.F.R. § 1630.2(i).

The ADA also does not define the term "substantially limited" or otherwise specify how to determine whether an individual is substantially limited in a major life activity. The EEOC regulations define substantially limits in pertinent part as follows:

> (1) The term *substantially limits* means:
> (I) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

---

[4]The Court observes that the Supreme Court has yet to decide the level of deference due the EEOC regulations on the ADA. *Toyota Motor Mfg, Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002). However, the regulations have been widely accepted as reasonable and persuasive, and this Court will treat them as such. *See Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 724 n.1 (6th Cir. 2000).

> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (I) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j). The Court is mindful of the Supreme Court's direction that the determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).

Here, plaintiff claims he is disabled because he has a physical impairment, namely fibromyalgia. [Doc. 1 at ¶¶ 9, 13.] The plaintiff has not alleged that he has a record of an impairment or was regarded by the defendant as having such an impairment. Accordingly, the Court will limit its analysis to the first definition of disability, that is, whether plaintiff has a physical or mental impairment that substantially limits one or more major life activities.

The parties do not dispute that plaintiff suffers from fibromyalgia, a disorder that has been found by other courts to be a physical impairment. *See, e.g.*, *Harding v. Cianbro Corp.*, 436 F. Supp. 153, 175 (D. Me. 2006); *Jackson v. City of Chicago*, 293 F. Supp. 2d 836, 840 (N.D. Ill. 2003); *Mincey v. Dow Chemical Co.*, 217 F. Supp. 2d 737, 742 (M.D. La. 2002). The question remaining is whether the plaintiff is disabled because, as he asserts, his impairment substantially limits the major life activity of working. [Doc. 34 at 2-3.] The parties do not appear to dispute that working constitutes a major life activity under the ADA.[5]

---

[5]Plaintiff claims that "no dispute exists that 'working' is a major life activity under the Americans with Disabilities Act or Rehabilitation Act" [Doc. 34 at p. 2.], and nowhere does defendant dispute that assertion.

9

While the Sixth Circuit has recognized working as a major life activity under the ADA, it has also noted that it is difficult for a plaintiff to prevail on such a claim given the conceptual difficulties involved in defining working as a major life activity. *Dunaway v. Ford Motor Co.*, 134 Fed. Appx. 872, 879 (6th Cir. 2005).

To be substantially limited in the major life activity of working, an individual "must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Mahon v. Crowell*, 295 F.3d 585, 591 (6th Cir. 2002) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-92 (1999)). Put another way, if a myriad of jobs are available to an individual who is afflicted by a physical or mental ailment, that individual is not precluded from a broad range of jobs and accordingly does not have a disability under the ADA or Rehabilitation Act. *Dunaway*, 134 Fed. Appx. at 879. The Supreme Court has emphasized that the requirement that the major life activity of working be substantially limited "create[s] a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 297 (2002). Only individuals whose ability to work is significantly restricted by a physical ailment, not merely different because of it, can qualify as individuals with disabilities under the ADA or Rehabilitation Act. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999).

In support of his contention that he is substantially limited in working, plaintiff asserts that his fibromyalgia "limits his ability to do his job at certain periods of the day." [Doc. 34 at 3.] Specifically, he alleges that he cannot work a shift from 10:00 a.m. to 6:30 p.m. [*Id.* at 2] and supports this allegation with several letters from Dr. Rankin, who opines that

10

plaintiff has "severe pain and decreased energy" after 3:00 p.m. [Doc. 33, Ex. 2.] Plaintiff admits that he can work a shift from 8:00 a.m. to 4:30 p.m [Doc. 33, Israel Aff. at ¶ 2], and he continues to do so. [Doc. 25, Pl. Depo. at 261.] Furthermore, plaintiff admits that he is not limited with respect to any of the activities which are necessary for him to carry out his job [Doc. 25, Pl.'s Depo. at 282-84], nor does he dispute defendant's contention that he unable to do anything now that he was able to do prior to his diagnosis of fibromyalgia. [Doc. 26 at pp. 29-30].

Simply being unable to work during particular times of the day is the kind of minor disturbance that does not preclude an individual from engaging in a broad range of jobs and therefore, does not qualify as a disability. *See Dunaway*, 134 Fed. Appx. at 877 ("An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation...."). As the Sixth Circuit has emphasized, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *McKay v. Toyota Mfg., U.S.A., Inc.*, 110 F.3d 369 (6th Cir. 1997). By his own admission, plaintiff is not even limited to that extent; he admits he can still perform all the essential functions of his job. [Doc. 25, Pl.'s Depo. at 283.] There is nothing in the record suggesting that plaintiff cannot continue working in his current position, much less that he is categorically precluded from a class of jobs Plaintiff's inability to work a later shift interferes with plaintiff's ability to work in only a minor way and therefore does not constitute a substantial interference with his ability to work. *Toyota Motor Mfg.*, 534 U.S. at 197 (noting that "[t]he word 'substantial' thus clearly precludes

11

impairments that interfere in only a minor way with the performance of...tasks from qualifying as disabilities."). As such, plaintiff is not disabled within the meaning of the ADA or Rehabilitation Act and has therefore failed to make out a prima facie case of disability discrimination under the Rehabilitation Act.

Even if plaintiff's condition qualified as a disability under the Rehabilitation Act, there is no indication that defendant has failed to accommodate plaintiff's requests for a modified schedule. Under the Rehabilitation Act, an employer who is a recipient of federal funds must make a reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with disabilities, unless such accommodations would impose an undue hardship on the operation of the employer's business or program. 45 C.F.R. § 84.12(d). Under the ADA, such reasonable accommodations may include "job restructuring [or] part-time or modified work schedules." 42 U.S.C. § 12111(9).

Because fibromyalgia allegedly causes plaintiff to become "extraordinarily fatigued as the work day progresses," plaintiff requested that he be allowed to report to work early in order to finish his shift by mid afternoon. [Doc. 1 at 3-4.] By plaintiff's own admission, defendant has accommodated him in the manner he requested: he continues to work the 8:00 a.m. to 4:30 p.m. schedule and is allowed to take leave time as necessary. [Doc. 25, Pl. Depo. at 261-64.] Plaintiff, however, continues to claim that defendant did not accommodate his alleged disability because its upper management sought to change plaintiff's schedule to the later 10:00 a.m. to 6:30 p.m. time frame [Doc. 34 at 3], a shift change that plaintiff was never

12

forced to work because defendant eventually hired another physician for that shift. [Doc. 36 at 9.] Plaintiff's argument that his alleged disability was not accommodated seems to be grounded in the notion that plaintiff was asked by defendant to work the later shift and substantiate why he could not do so when he refused to work the later shift. This, however, does not change the fact that plaintiff was never required to work the later shift and, by plaintiff's own account, is allowed to take leave time as necessary. Employers are not required to accommodate employees in the exact way they request, s*ee Hankins v. The Gap, Inc.*, 84 F.3d 797, 800-801 (6th Cir. 1996) ("an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided"), and this logically extends to the manner in which an employer attempts to accommodate an employee. Defendant was entitled to require that plaintiff provide some substantiation of his alleged disability before exempting him from working the later shift. *E.E.O.C. v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) ("[T]he employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement."). Doing so does not result in defendant not accommodating plaintiff. Plaintiff, therefore, has not presented any facts to support his allegation that defendant did not accommodate his fibromyalgia.

    C.    <u>Hostile Work Environment</u>

Plaintiff argues that defendant harassed him because of his disability, thereby creating a hostile work environment in violation of the Rehabilitation Act. [Doc. 34 at 4-5.]

13

However, to establish a claim for a hostile work environment, plaintiff must show that: (1) he is disabled; (2) that he was subjected to unwelcome disability discrimination; (3) that the harassment was based upon his disability; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile or offensive work environment; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (holding that the elements of a hostile work environment claim are the same across discrimination contexts); *Plautz v. Potter*, 156 Fed. Appx. 812, 818 (6th Cir. 2005) (applying the elements of a hostile work environment claim within the context of the Rehabilitation Act). In light of the Court's conclusion that plaintiff is not disabled under the Rehabilitation Act, plaintiff cannot prevail on his hostile work environment claim. *Reid v. Runyon*, 34 Fed. Appx. 469, 470 (6th Cir. 2002) ("Absent a disability, [a plaintiff] cannot prevail on his hostile work environment claim.").

Assuming again, however, that plaintiff's condition qualifies as a disability under the Rehabilitation Act, plaintiff has not presented sufficient evidence to show that he was the victim of a hostile work environment. The Supreme Court has explained that for a plaintiff to have suffered from a hostile work environment, the workplace in question must have been "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff's arguments that he was the victim of a hostile work environment are based upon allegations

that the defendant "press[ed] Plaintiff and his physician about working from 10:00 a.m. to 6:30 p.m.," [Doc. 34 at 5] "repeatedly requested from Plaintiff medical documentation of his condition," [Doc. 1 at ¶ 9] and made "repeated inquiries of [plaintiff] about when he was going to retire." [Doc. 1 at ¶ 10.] Plaintiff asserts that defendant's requests "took a physical and mental toll on him." [Doc. 34 at. 5.] Defendant claims that its inquiries were made to "understand and thus be able to accommodate Plaintiff's alleged disability." [Doc. 36 at 11.] Defendant also argues that it was required to make multiple inquiries to plaintiff and his doctor due to lack of responsiveness on their part. [*Id.* at 11-12.] In total, there were nine of these requests made from defendant to plaintiff and his physician over a five month period.[6] [Doc. 33, Ex. A-C.]

The Sixth Circuit has made it clear that conversations between an employee and his superiors about that employee's job do not rise to the level of being harassment "simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). Furthermore, the ADA and Rehabilitation Act allow employers to make inquiries into an employee's medical conditions or require medical examinations in order to reasonably accommodate that employee. *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000). Defendant claims that it requested information from plaintiff and plaintiff's physician for precisely that reason: "to discern...whether Plaintiff could work the

---

[6]The Court notes that along with these nine pieces of correspondence, plaintiff submitted a number of additional letters and emails from defendant that do not bear upon the two Rehabilitation Act claims remaining in this case.

proposed later shift." [Doc. 36 at 10.] Under the ADA and Rehabilitation Act, defendant is not only permitted, but encouraged to make such inquiries, given that one of the purposes of the Acts is "to promote an interactive dialogue between an employer and employee to discover to what extent the employee is disabled and how the employee may be accommodated, if at all, in the workplace." *Prevo's Family Market, Inc.*, 135 F.3d at 1095. Plaintiff has failed to establish any facts concerning whether the harassment he claims took place was severe enough to create a hostile work environment.

### III. Conclusion

For the reasons set forth herein, the defendant's motion for summary judgment [Doc. 25] is hereby granted and this case will be dismissed. Because of the Court's ruling on the motion for summary judgment, defendant's motion in limine [Doc. 42] is **DENIED** as moot

The Clerk is directed to enter judgment accordingly.

s/ Thomas A. Varlan<br>
UNITED STATES DISTRICT JUDGE